No. 89,300

STATE OF KANSAS, *Appellee,* v. GREGORY C. FISHER, *Appellant.*
(154 P.3d 455)

274

Review of the judgment of the Court of Appeals in an unpublished decision filed February 11, 2005.

Opinion filed March 16, 2007.

*Michelle A. Davis,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Sherri L. Schuck,* assistant county attorney, argued the cause, and *Barry Wilkerson,* county attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Gregory C. Fisher was convicted of unlawful manufacture of methamphetamine, possession of ephedrine with the intent to manufacture methamphetamine, possession of anhydrous ammonia in an unapproved container for the production of methamphetamine, possession of methamphetamine, and possession of paraphernalia for use in the manufacture of methamphetamine. In *State v. Fisher,* No. 89,300, unpublished opinion filed February 11, 2005, a split Court of Appeals affirmed Fisher's convictions but remanded for resentencing in accordance with *State v. Campbell,* 279 Kan. 1, 106 P.3d 1129 (2005), and *State v. McAdam,* 277 Kan. 136, 83 P.3d 161 (2004). This court granted Fisher's petition for review; our jurisdiction is under K.S.A. 60-2101(b).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court err in failing to suppress evidence obtained pursuant to a search warrant partially based upon the contents of a trash bag seized from Fisher's property? No.

2. Did the district court's admission of hearsay evidence violate Fisher's right to confrontation under the Sixth Amendment to the United States Constitution? No.

3. Are Fisher's convictions for possession of ephedrine and possession of paraphernalia multiplicitous with his conviction for manufacture of methamphetamine? No.

## FACTS

On August 20, 2001, Detective Shane Jager of the Pottawatomie County Sheriff's Department received information from fellow deputy Paul Hoyt concerning suspicious activity at 12420 Highway 63, Emmett, in Pottawatomie County. The property is located in a rural area approximately 4 miles north of the town of Emmett, on the west side of Highway 63. There are no other houses in the general vicinity on the west side of the highway. On the east side of the highway, the closest neighbor's house is approximately a quarter of a mile away.

The property is bounded on the east by Highway 63 and by barbed wire fencing on the north, south, and west which separates the property from surrounding pasture. Photographs reveal the house is approximately 25 yards west of the highway and sits on the northeast part of the property. Its front porch and door face south. A large shed (barn) is located 50 to 60 yards straight west of the house's western exterior near the barbed wire fence. A second, smaller shed sits equidistant between the house and the barn, but somewhat north, actually forming part of the north fence.

From Highway 63, a driveway runs from east to west on the south of the house, curving to the north and ending in a turn-around near the center of the area bounded by the three buildings. The only apparent walkway or sidewalk leads directly south from the house's front door to the driveway. According to photographs in the record, several large trees surround the house inside of the driveway.

According to Jager's suppression hearing testimony, Deputy Hoyt told him that a concerned citizen noticed a strong or peculiar odor emanating from trash being burned on the property and also observed numerous cars stopping there for short intervals of time. Hoyt further relayed to Jager that on August 28, 2001, he received information from another concerned citizen that a white female driving a van—that had been seen coming and going from the residence—drove to a shed located on the property, emptied boxes, placed more boxes in the van, and then left.

At approximately 1 a.m. on the day after Hoyt relayed the information about the delivery of boxes, Jager, Sergeant Chris Schmidt, and Deputy Shane Van Meter went to the area to determine if they could observe anything. While standing in a grass field to the west of the property, and approximately 30 yards west of the barn, Jager noticed a strong odor of ether. Based on his special training, coupled with the prior information of cars stopping at the residence, Jager suspected that methamphetamine was being manufactured and sold there.

Later that morning, Jager returned to the area twice more, once with the county attorney. From his parked position near Highway 63 about 50 yards south of Fisher's driveway, and once again off of Fisher's property, Detective Jager saw a burn barrel and a white translucent plastic trash bag near the barn. He then used binoculars to observe that the bag contained yellow containers. Based upon his training and experience, he associated the yellow bottles with the manufacture of methamphetamine, *i.e.*, Heet bottles. Jager then walked to the field north of the property, where he again smelled ether. Jager testified that at that point he "[a]sked [the county attorney] how he felt about the trash bag. He said . . . it was not on curtilage, that I could obtain the trash bag, and I advised him that I would like to try . . . to talk to the residents, see what we could obtain from them, and that's when I went to the door of the residence."

Jager testified that after this discussion with the county attorney he got back in his vehicle and

"I pulled my patrol vehicle in the driveway, went to the front door, knocked on the door several times. [After no answer,] I got back in my vehicle and there's a

circle driveway that goes around the back side of the residence there, got in, drove by. When I was driving by the white trash bag I noticed Actifed blister packs, several Heet bottles, and—and that's when I collected that white trash bag.

. . . .

". . . I was circling around to leave the property. I had taken this, if you want to say southwest part of the circle drive and started back around . . . and I could see that there were Heet bottles, Actifed blister packs, and pseudoephedrine."

Jager brought the bag to the sheriff's department for examination. In addition to the Heet bottles and 8 to 10 packs of ephedrine, the bag contained plastic gloves, coffee filters with a pinkish powder residue, and miscellaneous trash, including documents identifying Greg Fisher and Betty Harper.

Based upon the tips and Jager's information observed and obtained at the scene, including the contents of the bag, he applied for a search warrant which was obtained from Magistrate Judge Blaine A. Carter and executed for the house, outbuildings, and vehicles. Inside the doorway of the house, Jager found another white trash bag containing empty blister packs of pseudoephedrine, battery casings, lithium casings, three bottles of Heet, coffee filters, and other miscellaneous trash. He also found a white, cylinder-style grinder containing a pinkish substance on top of the microwave. In addition, he located pipes used to smoke methamphetamine and marijuana, glass jars containing residue, items used to manufacture methamphetamine, methamphetamine, and a cellophane bag containing ephedrine.

Inside the barn west of the house, law enforcement officers found a freezer containing a cooler of anhydrous ammonia. They also found a gas generator, rock salt, acid, coffee filters, a blender, Heet bottles, isopropyl alcohol, vinyl gloves, mason jars, a hypodermic needle, several pieces of hose, Epsom salt, Zip-Lock baggies, empty blister packs of pseudoephedrine, and battery parts to at least 59 " 'Energizer L91 AA' " lithium batteries.

Approximately 1 hour after the search warrant was initially executed, Betty Harper arrived at the property. Defendant Fisher and David Holden arrived a few hours later. Fisher's left front pocket contained two baggies and a glass vial containing a powdery substance. All three items tested positive for methamphetamine.

Fisher was charged with unlawful manufacture of a controlled substance, possession of ephedrine with the intent to manufacture a controlled substance, unlawful possession of anhydrous ammonia, possession of methamphetamine, and possession of drug paraphernalia.

Prior to trial, Fisher moved to suppress all evidence seized from the property. After a hearing, the district court denied Fisher's motion.

Detective Jager, Detective Paul Schliffke, KBI Agent William Smith, Jeff Rosell, James Schieferecke, Jr., Betty Harper, and Mendy Roma all testified at the jury trial on behalf of the State. Fisher testified on his own behalf.

Detective Jager testified generally consistent with his suppression hearing testimony.

Among other things, Agent Smith testified about David Holden's statements. According to Smith, Holden told him that Holden stayed at the Fisher residence; that Fisher had three "eight balls" or 8 ounces of methamphetamine with a street value of approximately $750; that Holden and Fisher had used several grams of methamphetamine on August 29, 2001; that Fisher had given Holden a gram of methamphetamine; and that Holden believed he saw Fisher previously cooking methamphetamine. Holden was not present to testify. Nevertheless, the court also admitted Holden's written statement dated August 30, 2001.

Betty Harper testified that she lived at the residence with Fisher, her fiancé. Approximately 1 month before Fisher's arrest, Harper wrote a letter to Fisher asking him to stop the "hobby in the barn." Harper stated that she used methamphetamine she received from Fisher; however, she opined that to her knowledge, Fisher did not "cook" the methamphetamine.

Mendy Roma testified that she dated Fisher prior to his arrest. The day before Fisher's arrest, she went to the residence and observed him manufacturing methamphetamine in the back of his truck. She also testified that she witnessed Fisher manufacturing methamphetamine in the barn on several occasions.

For the defense, Fisher testified that Roma's friends, not he, used his barn to manufacture methamphetamine.

The jury convicted Fisher on all counts. A majority of the Court of Appeals affirmed Fisher's convictions, but remanded for re-sentencing in accordance with *Campbell*, 279 Kan. 1, and *Mc-Adam*, 277 Kan. 136. Among other things, the majority held that the trial court did not err in refusing to suppress the evidence because the trash bag—upon which the search warrant was partially based—was observed in an open field 50 yards from the house and seized while in plain view.

Judge, now Justice, Lee A. Johnson dissented, stating that the encroachment into Fisher's backyard was unlawful and that a neutral magistrate should have made the probable cause determination prior to the trash bag's retrieval. He also expressed concern with the majority's expansive definition of an "open field." *Fisher*, slip op. at 22-23. (Johnson, J., dissenting.)

## ANALYSIS

Issue 1: *The district court did not err in failing to suppress evidence obtained pursuant to a search warrant partially based upon the contents of the trash bag seized from Fisher's property.*

Fisher has consistently maintained that the State unlawfully seized the white trash bag from his property because it was within his curtilage. Because the warrant was issued based in part upon facts gleaned from this alleged unconstitutional seizure, he claims the evidence seized pursuant to the improper warrant was fruit of the poisonous tree and should have been suppressed. *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). At oral arguments, the State responded that the bag was outside the curtilage and, if not, it was seized while in Jager's plain view.

When reviewing a motion to suppress evidence, this court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. This court will not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent review. *State v. Horn*, 278 Kan. 24, 30, 91 P.3d 517 (2004).

In rejecting Fisher's challenge, the district court examined the totality of the circumstances to justify the issuance of the magistrate's search warrant. During this examination, the court found that the bag was seized from outside the curtilage. It did not address the State's alternative claim that the plain view exception to warrantless searches applied. The district court stated:

"All right. The test that the Court must use when issuing a search warrant is the totality of the circumstances. You don't isolate individual things. You take all those observations, all that knowledge that law enforcement acquires and together you observe or determine whether there's probable cause. A law enforcement officer doesn't have to prove guilt. This is merely probable cause, suspicion to believe, reasonable suspicion.

"Here we had a report by a concerned citizen of a smell that was a strange smell to be associated with the burning of trash. Officers then went to an open field and observed from that field a trash bag that had bottles in it, yellow, that were consistent with ether Heet bottles, which is a known ingredient of the manufacturing of methamphetamine. And [Jager] smelled an odor consistent with ether, which is also a known substance with the manufacturing of methamphetamine. They then received a report that there was a lot of traffic that would come and go at night, which is consistent with drug trafficking at the residence. This is known to law enforcement. Ultimately, the officers went to the house to inquire. They had a right to be there. They have a right to go to the house and knock and talk to the occupants when they have that kind of information. They weren't trespassing at [that] point; and even if they were, this is not trespassing in the constitutional sense. It's a common law trespass, but it doesn't constitute an invasion of privacy when they went to that residence. *The contents of that plastic trash bag, which wasn't protected from rural—this wasn't curtilage as I see it and under these facts. The Heet bottle that* [then] *became readily apparent, as did* [*blister packs of pseudoephedrine,* after the attempted knock and talk] *which are a known precursor for the manufacturing of methamphetamine. They had a right to take the trash,* and what they found was further consistent with the process of manufacturing methamphetamine, specifically the coffee filters with the pinkish, powdery residue. These are consistent with items of manufacturing methamphetamine.

". . . [T]he motion to suppress will be denied." (Emphasis added.)

While Fisher objects to the seizure of the bag, he does not dispute the propriety of the methods or locations, on and off the premises, used for obtaining information, *i.e.*, ether odor and apparent yellow containers in the bag, up to and including Jager's knock and talk. He essentially argues that lawfully made observa-

tions do not equate to the right to seize. "[W]hile the characterization of an observation as a nonsearch plain view situation settles the lawfulness of the observation itself, it does not determine whether a *seizure* of the observed object would likewise be lawful." (Emphasis added.) 1 LaFave, Search & Seizure § 2.2(a), p. 450 (4th ed. 2004). See, *e.g.*, *State v. Blair*, 31 Kan. App. 2d 202, Syl. ¶ 3, 62 P.3d 661 (2002) (officers lawfully on street smelled ether coming from an attached garage but had no probable cause to search the garage and residence where they found evidence of manufacture of methamphetamine).

At the scene, however, and now on appeal, the county attorney concluded the bag lawfully observed by Jager could be seized from Fisher's property because (1) it was trash and (2) it was outside the curtilage. Curtilage is the area surrounding the residence, to which historically the Fourth Amendment protection against unreasonable searches and seizures has been extended. See *State v. Basurto*, 15 Kan. App. 2d 264, 266, 807 P.2d 162, *aff'd* 249 Kan. 584, 821 P.2d 327 (1991) (citing *United States v. Dunn*, 480 U.S. 294, 300, 94 L. Ed. 2d 326, 107 S. Ct. 1134, *reh. denied* 481 U.S. 1024 [1987]).

*California v. Greenwood*, 486 U.S. 35, 100 L. Ed. 2d 30, 108 S. Ct. 1625 (1988), is of guidance on the seizure issue. There, the Supreme Court addressed a situation where (1) the trash bag (2) was admittedly outside the curtilage; it determined seizure was proper. Despite the seizure of the bag from outside the curtilage, the Court nevertheless engaged in a reasonable expectation of privacy analysis. 486 U.S. at 39-44. Since *Greenwood*, lower courts have struggled with exactly how the concept of curtilage fits into the analysis of trash seizures. See *e.g.*, *United States v. Redmon*, 138 F.3d 1109 (7th Cir.) (en banc), *cert. denied* 525 U.S. 1066 (1998). In trash cases, this court has not only analyzed whether curtilage exists but also whether the owner has a reasonable expectation of privacy in the trash. See *State v. Kimberlin*, 267 Kan. 659, 662-66, 984 P.2d 141 (1999).

In *Kimberlin*, the defendant placed his trash in opaque trash bags. He then put them out for city trash collection by placing them in the location customarily used for trash pickup: 5 to 8 feet

from the public street which was 50 to 55 feet in front of his house in El Dorado. A drainage ditch ran between the bags and the street. There was no fence or barrier separating the trash from the street other than the drainage ditch. Defendant mowed the entire area, including the ditch. Similar to the instant case, the police retrieved the bags, discovered contraband and paraphernalia, and used the contents to support a search warrant. The execution of the warrant revealed marijuana and drug paraphernalia which served as evidence to convict. The defendant contended on appeal that the trash bags were unlawfully taken and examined by law enforcement.

As our first reason for upholding the seizure, we began by observing that the curtilage concept was not part of the *Greenwood* Court's rationale in deciding the issue. Instead, *Kimberlin* noted: "[T]he *Greenwood* holding was based upon Greenwood's lack of a reasonable expectation of privacy in his discarded trash. Absent such a reasonable expectation of privacy, there is no violation of the Fourth Amendment. Clearly, under *Greenwood,* the search of defendant's trash herein was not constitutionally impermissible as claimed." 267 Kan. at 663.

We turned to a second reason for upholding the seizure, rejecting Kimberlin's argument that prior Kansas case law discussing curtilage in other contexts required us to distinguish *Greenwood* and reach a different result based upon the search and seizure section of the Kansas Constitution Bill of Rights, § 15. 267 Kan. at 664. In responding to his argument, we discussed *United States v. Long,* 176 F.3d 1304 (10th Cir. 1999), which addressed both the curtilage and the reasonable expectation of privacy arguments. We held:

"As in *Long,* [1] there was no indication that this was a secluded place or a place used for intimate activities associated with the sanctity of the home, thus, it does not have the basic attributes of curtilage. [2] *Whether the trash was inside or outside the curtilage is not determinative in garbage cases.* Once defendant placed his trash out for collection adjacent to a public thoroughfare, he defeated any reasonable expectation of privacy in the garbage. *Long* supports the state's position in this case, as does *Greenwood.*" (Emphasis added.) *Kimberlin,* 267 Kan. at 666.

To analyze the parties' positions in the instant case, we will therefore examine both curtilage and reasonable expectation of privacy in trash.

*Curtilage*

The State has the burden of proof to show that a search and seizure was lawful. *State v. Damm*, 246 Kan. 220, 222, 787 P.2d 1185 (1990) (citing *Mincey v. Arizona*, 437 U.S. 385, 390-91, 57 L. Ed. 2d 290, 98 S. Ct. 2408 [1978]). Because the State alleges the area is not curtilage, it therefore has the burden of proving that point.

However, the standard of review for whether the bag was seized from within the curtilage has not been established in Kansas law. In *Kimberlin*, 267 Kan. at 666, this court determined that the property did "not have the basic attributes of curtilage." However, we did not state our standard of review; rather, because the relevant facts were not in dispute, we concluded that the general question of whether to suppress the seized evidence was a matter of law with an unlimited scope of review. 267 Kan. at 662.

Other courts are split. Many federal circuit courts of appeals, for example, have held that the determination of curtilage is a question of fact. See, *e.g.*, *Long*, 176 F.3d at 1308 (curtilage is a factual determination subject to clearly erroneous standard of review); *United States v. Reilly*, 76 F.3d 1271, 1275 (2d Cir. 1996); *United States v. Friend*, 50 F.3d 548, 552 (8th Cir. 1995); *United States v. Brady*, 993 F.2d 177, 178-79 (9th Cir. 1993); *United States v. Acosta*, 965 F.2d 1248, 1255 (3d Cir. 1992); *United States v. Hatch*, 931 F.2d 1478, 1480 (11th Cir. 1991). For state courts, see *State v. Sutton*, 112 N.M. 449, 452, 816 P.2d 518 (1991); *State v. Russo*, 68 Or. App. 760, 763, 783 P.2d 163 (1984).

The recent trend, however, has been to treat the issue as a mixed question of fact and law. Several courts rely upon the Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996), which held that on appeal, a judge's ultimate determination of Fourth Amendment questions similar to curtilage—reasonable suspicion and probable cause—should be reviewed de novo, while findings of historical fact should be reviewed only for clear error under the federal rules. See *United States v. Breza*, 308 F.3d 430, 435 (4th Cir. 2002); *United States v. Diehl*, 276 F.3d 32, 37 (lst Cir. 2002); *United States*

*v. Johnson,* 256 F.3d 895, 898, 911-13 (9th Cir. 2001); *State v. Martwick,* 231 Wis. 2d 801, 811-14, 604 N.W.2d 552 (2000); see also *United States v. Reilly,* 91 F.3d 331, 331 (2d Cir. 1996) (assumed, without deciding, that *Ornelas* requires appellate court to review the district court's finding of curtilage de novo.) As the First Circuit Court of Appeals stated in *Diehl:* "As in those inquiries, the question of curtilage requires a court to make a legal judgment about the significance of a collection of facts." 276 F.3d at 37. Accordingly, "[t]here is no conceptual difference between calling an area 'curtilage' and telling an officer he had 'probable cause' or 'reasonable suspicion.'" *Johnson,* 256 F.3d at 912.

Several of these courts also rely upon their own historical two-step standard of review to constitutional search and seizure inquiries, noting that "[w]hether an officer has illegally searched within the curtilage of a person's residence is a search and seizure issue under the Fourth Amendment." *Martwick,* 231 Wis. 2d at 812-13; see also *Diehl,* 276 F.3d at 38 (" 'In scrutinizing a district court's denial of a suppression motion, the court of appeals will review findings of fact for clear error, while at the same time subjecting the trial court's ultimate constitutional conclusions to plenary oversight.' "); *Breza,* 308 F.3d at 435 ("We [Fourth Circuit] agree with the First Circuit that the *Ornelas* standard—which is the same as that traditionally applied by this circuit to rulings on suppression motions, *see Rusher,* 966 F.2d at 873—applies to curtilage determinations.").

We agree with this recent trend for several reasons. First, we have relied upon the *Ornelas* rationale in the area of the voluntariness of the waiver of *Miranda* rights. See *State v. Mattox,* 280 Kan. 473, 483, 124 P.3d 6 (2005) (" 'Like the issue of the voluntariness of a defendant's statement, the voluntariness of a *Miranda* waiver requires assessment of the historical facts of the case in light of a prevailing legal standard. Like the issue . . . in *Ornelas,* independent review is necessary to ensure uniformity of decision and the predictability and ease of administration that follow from uniformity of decision.' "). Second, as stated above, we also rely upon a two-step standard of review in ruling on suppression issues. *Horn,* 278 Kan. at 30.

We conclude that the question of curtilage is a mixed question of fact and law. Accordingly, we review the district court's factual findings for substantial competent evidence and review de novo the district court's legal conclusion whether a particular seizure occurred within the curtilage.

Without elaboration, the district court in the instant case simply concluded that the trash bag was not within the curtilage. Without the benefit of the standard of review we articulate today, a majority of the Court of Appeals panel affirmed this determination.

The Court of Appeals correctly acknowledged the central place that *Dunn*, 480 U.S. 294, occupies in the curtilage analysis. *Dunn* cited *Oliver v. United States*, 466 U.S. 170, 180, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984), as recognizing that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. 480 U.S. at 300. *Dunn* also acknowledged that *Oliver* identified the central component of this inquiry as whether the area harbors the " 'intimate activity associated with the "sanctity of a man's home and the privacies of life." ' " 480 U.S. at 300.

The *Dunn* Court held that curtilage questions should be resolved with particular reference to four factors:

"[1] The proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by. [Citations omitted.]" 480 U.S. at 301.

The *Dunn* Court was also quick to point out, however:

"We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that is should be placed under the home's 'umbrella' of Fourth Amendment protection." 480 U.S. at 301.

In concluding that the bag was outside the curtilage, the Court of Appeals explained as follows:

"Here, [1] the trash bag was located approximately 50 yards from Fisher's residence. [2] The property is surrounded by a barbed wire fence. However, such fences are 'designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas.' *United States v. Dunn*, 480 U.S. 294, 303, 94 L. Ed. 2d 326, 107 S. Ct. 1134 (1987).

"[3] Fisher used the area to store and incinerate trash. Although Fisher did not set his trash out to be collected by a third party as in *Greenwood*, the trash did remain readily accessible to scavengers. [See *Greenwood*] 486 U.S. at 40. In addition, by incinerating his refuse, Fisher was voluntarily revealing certain characteristics of his trash to the public. Significantly, the initial tip in this case involved a concerned citizen's report of peculiar-smelling trash being burned at Fisher's residence. Therefore, the act of burning trash does not constitute an 'intimate activity associated with the sanctity of a person's home and the privacies of life.' [Citation omitted.]' *Tinsley*, 16 Kan. App. 2d at 290-91.

"[4] Finally, as the trash bag was observable from a nearby highway, Fisher had taken no steps to conceal it from observation by people walking by. Therefore, the trash bag at issue in this case was located in an open field, and not within the curtilage of Fisher's home, when it was observed by Detective Jager. Accordingly, under *Oliver*, Detective Jager's visual observation of the trash bag did not violate the Fourth Amendment." *State v. Fisher*, No. 89,300, unpublished opinion filed February 11, 2005, slip op. at 7-8.

Because the district court made no findings of fact directly supporting its conclusion regarding the curtilage issue using the *Dunn* analysis, the Court of Appeals was unable to apply a substantial competent evidence standard. It apparently reviewed the record de novo for the facts it recited. The record affords us the same opportunity—and to point out additional facts.

The Fisher property is bounded on the east by the highway and on the west, north and south by a barbed wire fence. Outside the fence is farm ground in three directions. According to the photographs, inside the fence is short grass which appears to be mowed and maintained throughout. Inside the fence are a house on the east, a barn 50 to 60 yards straight west of the house's western exterior near the western barbed wire fence, and a small shed equidistant between the house and the barn but somewhat north, actually forming part of the north fence. Photographs reveal the eastern edge of the house is approximately 25 yards west of the highway and sits on the northeast part of the property. Its front porch and door face south.

From Highway 63, a driveway runs from east to west on the south of the house, curving to the north and ending in a turn-around near the center of the area bounded by the three buildings—which Jager described as the "back side of the house." The only apparent walkway or sidewalk leads directly south from the house's front door to the driveway. According to photographs in the record, several large trees surround the house inside of the driveway. Photographs show that vehicles are parked in the area formed by the three buildings. A garden apparently is between the barn and shed in the northwest corner of the property. A power pole with a readable electricity meter is near the curve (from west to north) in the driveway. A "Notice, No Trespassing" sign is on another pole near the entrance to the driveway from the highway. The bag was found between the house and the barn, *i.e.*, within the area bounded by the three buildings.

We begin our determination by observing this is rural property, 4 miles from the nearest town. There are no other houses in the general vicinity of the house on the west side of the highway. On the east side of the highway, a neighbor's house sits approximately a quarter of a mile away. See *Reilly*, 76 F.3d at 1277 ("curtilage may reach a larger area in a rural setting"). We next apply the *Dunn* factors:

(1) Proximity of the area claimed to be curtilage to the home: We agree that "[t]here is not any fixed distance at which curtilage ends." *United States v. Depew*, 8 F.3d 1424 (9th Cir. 1993). Here, although the barn is 50-60 yards west of the house's western edge, the exact distance of the trash bag from any feature is unknown, but it was found between the barn and house, albeit nearer the barn. See *United States v. Swepston*, 987 F.2d 1510, 1514-15 (10th Cir. 1993) (chicken shed approximately 100 feet from house within curtilage); *State v. Rogers*, 161 Vt. 236, 241-45, 638 A.2d 569 (1993) (garden within curtilage though 150 feet from house). Several courts have noted that in the context of a rural setting, the area extending to outbuildings may be in the curtilage. See *State v. O'Brien*, 223 Wis. 2d 303, 310, 588 N.W.2d 8 (1999) (200 feet, farm complex consisted of duplex, a barn, an outbuilding, a small backyard, and two driveways.); *cf. State v. Tinsley*, 16 Kan. App.

2d 287, 292, 823 P.2d 205 (1991) (barn and cattle shed "could often be presumed to be used in the 'intimate activity' of a rural farm home").

(2) Whether the area is included within an enclosure surrounding the home: There is barbed wire fencing on three sides and a highway on another. See *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (backyard within curtilage, as it "enclosed on three sides by a wire fence" and "the fact that the yard and the house lie within the same fenced-off area is particularly significant."); *Swepston*, 987 F.2d at 1514-15 (chicken shed within curtilage where barbed wire fence encircled both house and shed and no fence separated the two; garden not within curtilage where it separated from house by chain-link fence.) Moreover, the area within the barbed wire fence appears to be mowed and maintained. See *Swepston*, 987 F.2d at 1512 (area between house and chicken shed which consists mainly of trees and underbrush is maintained and kept cleared by property owner, and there is a path leading from house to chicken shed.); see *Martwick*, 231 Wis. 2d at 820-21 (marijuana plants outside curtilage, as beyond point where "curtilage is clearly marked by the low-cut weeds and brush," after which "tree line then suddenly appears").

(3) The nature of the uses to which the area is put: the bag was found between the barn and the driveway which splits the area between the house and the barn. Photographs show vehicles are parked on the driveway, between the driveway and the house, and between the driveway and the small shed. Additionally, the barbed wire fence-enclosed area also apparently includes a garden between the barn and shed. See *Jenkins*, 124 F.3d at 773 (backyard within curtilage, as it was used, among other things, "as an area to garden;" *Rogers*, 161 Vt. at 241-43 (garden within curtilage, as "gardening is an activity often associated with the curtilage of a home").

(4) The steps taken by the resident to protect the area from observation by people passing by: The bag was found nearly 100 hundred yards from the highway, *i.e.*, behind the large two-story house whose eastern edge is 25 yards west of the highway and near the barn which, because of the size of the house, is more than 50-60 yards further west of the highway. According to the photo-

graphs, from the highway the house would have blocked a direct view of the bag, and the bag would have been observable only from obliques to the house, concomitantly from further distances. Outside of that distance, the house's placement, the remoteness of the house from other rural homes in the area, and a "No Trespassing" sign, however, there is nothing to suggest the residents took any particular precautions to prevent observation. As the Court of Appeals panel noted, the barbed wire fences do not prevent observation. Ether was smelled from outside the property. Yellow containers in the translucent bag were discovered through a detective's use of binoculars while parked near the highway and oblique to the house.

As the *Dunn* Court warned, however, the mere combining of these factors does not produce

"a finely tuned formula that, when mechanically applied, yields a 'correct answer' to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." 480 U.S. at 301.

Based upon these facts, particularly this rural environment, we independently conclude the trash bag was found within the curtilage. We hold that in rural Kansas, Fisher's area " 'harbors the intimate activity associated with the "sanctity of a person's home and the privacies of life," ' " *Dunn*, 480 U.S. at 300.

*Reasonable expectation of privacy*

Even though we have concluded that the trash bag was seized from within the curtilage, we still need to examine whether Fisher maintained a reasonable expectation of privacy in the bag. See *Kimberlin*, 267 Kan. at 666 (curtilage is not determinative in garbage cases). As the Court of Appeals stated in *State v. Fortune*, 28 Kan. App. 2d 559, 563, 20 P.2d 74, *rev. denied* 271 Kan. 1039 (2001):

"Under *Greenwood*, the location of a person's garbage standing alone does not establish whether the search of the garbage was reasonable; rather, the analysis must include an examination of whether the person manifested a subjective expectation of privacy in the trash container and whether that expectation of privacy in the garbage is objectively reasonable."

The *Fortune* court concluded that the defendant had no reasonable expectation of privacy in discarded trash, "even if it were within the curtilage of his home." 28 Kan. App. 2d at 567; see also *State v. Alexander,* 26 Kan. App. 2d 192, 195-98, 981 P.2d 761, *rev. denied* 268 Kan. 888 (1999) (collection of trash cases); *Long,* 176 F.3d at 1308 ("Even if we were to conclude that the trash bags were within the curtilage, Defendant would not prevail. . . . Defendant must still show that he had a reasonable expectation of privacy in the trash bags. Defendant fails to do so.") (citing *Greenwood,* 486 U.S. at 39).

An important inquiry in applying the *Greenwood* analysis to garbage within the curtilage is whether the garbage was so readily accessible to the public that its contents were exposed to the public for Fourth Amendment purposes. See *United States v. Hedrick,* 922 F.2d 396, 400 (7th Cir. 1991). As the Tenth Circuit said in *Long,* 176 F.3d at 1308:

"In garbage cases, Fourth Amendment reasonableness turns on public accessibility to the trash. See *Greenwood,* 486 U.S. at 41, 108 S. Ct. 1625. Society does not recognize a reasonable expectation of privacy in 'trash left for collection in an area accessible to the public.' *Id.* . . . Applying *Greenwood* to the circumstances of this case, we conclude that Defendant exposed the garbage bags to the public to such a degree that he defeated his Fourth Amendment claim. See *id.* at 41."

In *Long,* defendant placed his garbage bags for commercial collection on top of a trailer parked only 3 feet from the alley behind his house. The Tenth Circuit noted: "As the district court found, anyone traveling down the alley could have reached up and snatched the bags." 176 F.3d at 1309. The court further found that the location was not secluded or difficult to reach. It was near the alley, and no fence or other barrier separated the trash from the alley. 176 F.3d at 1309.

In the instant case, we have something altogether different. The trash bag was placed almost 100 yards from the public highway, blocked from the direct east view from the highway by the house, obscured from the direct north view by the small shed, and blocked from the direct west view by the barn; the only unobstructed direct view was from the south—at the farthest end of the property considerably more than 100 yards away. Jager's oblique off-premises

vantage point was also more than 100 yards away from the bag; the bag's yellow containers were visible only with use of binoculars. The bag was not exposed for the public to see; indeed, it was not left out for commercial trash collection. Rather, it was placed on the ground near a barrel for eventual disposition by Fisher. The bag had been there from at least the time Jager had seen it with binoculars on August 29 until he returned later that day with the county attorney.

Under these circumstances, we conclude rural residents in Kansas would be quite surprised to learn that highway travelers, "children, scavengers, snoops and other members of the public" (*Greenwood*, 486 U.S. at 40) would be fully justified in pawing through the contents of a resident's trash bag placed approximately 100 yards from the highway and behind a rural home. See *State v. Kriley*, 976 S.W.2d 16, 23 (Mo. App. 1998) ("[I]t is reasonable to infer that the occupants of the residence would have been surprised to find uninvited guests in the structure.").

In short, we conclude that Fisher maintained a reasonable expectation of privacy in his trash bag at its specific location—a subjective expectation that was objectively reasonable. Accordingly, the bag's warrantless seizure was per se unreasonable unless permissible under some recognized exception to the warrant requirement. See *State v. Mendez*, 275 Kan. 412, 420-21, 66 P.3d 811 (2003).

*Plain view*

The State argued to the Court of Appeals panel, which agreed, that the warrantless seizure of the bag outside the curtilage was appropriate under the plain view doctrine. At our oral arguments, the State argued in the alternative, *i.e.*, even if the seizure occurred within the curtilage, as we have determined, that the plain view doctrine still justified the seizure. Under the facts of this case, we disagree for several reasons.

Before proceeding to analyze the possible application of the plain view doctrine to our facts, however, some background is in order. It is first important to keep clear the distinctions between the different types of "plain view." As the Supreme Court has

stated: " 'It is important to distinguish "plain view" as used in *Coolidge* [*v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, *reh. denied* 404 U.S. 874 (1971)] to justify *seizure* of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search, [citations omitted] . . . the former generally does implicate the Amendment's limitations upon seizures of personal property." *Horton v. California,* 496 U.S. 128, 133 n.5, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990).

A number of courts have therefore used the term "open view doctrine" to refer to the rule that no Fourth Amendment search occurs where a law enforcement officer observes incriminating evidence or unlawful activity from a nonintrusive vantage point. See, *e.g., State v. Clark,* 124 Idaho 308, 859 P.2d 344 (1993). Thus, the "open view" terminology distinguishes the analysis applicable to warrantless observations from the legally distinct "plain view" doctrine applicable to seizures. 124 Idaho at 313. It is unclear, however, which of the doctrines the State applies to which events on the day of the seizure.

As for any State contention that the open view of the bag from the highway justified the seizure, we repeat that lawful observation does not equate to lawful seizure. As stated by one commentator:

"[When] police officers stand[] outside a constitutionally-protected location observing items within that protected area . . . they may employ the information they have garnered through their observation, for example in seeking a warrant, [but] the view in and of itself does not justify an intrusion into the protected area. Simply because they have seen an item that they have a legitimate right to observe does not justify a warrantless intrusion into an otherwise constitutionally-protected area." Wallin, *Plain View Revisited,* 22 Pace L. Rev. 307, 325 (2002).

See also *United States v. Naugle,* 997 F.2d 819, 823 (10th Cir. 1993) (when officers make observations via long-range surveillance, they "cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises.").

Accordingly, unlike mere observations made under "open view," the phrase "plain view" refers to seizures, not searches; it deals with circumstances in which an officer has already justifiably in-

truded into a constitutionally protected area and then spots and removes incriminating evidence. 22 Pace L. Rev. at 325. In short, absent a justifiable intrusion onto Fisher's curtilage, the mere observation of the bag from the highway does not itself allow the bag's seizure.

As for any State contention that its justified intrusion was Jager's knock and talk and that the "plain view" of the bag obtained directly thereafter justified the seizure, we hold that the open observation of the bag from the highway—which led to the knock and talk—cannot also serve as a "plain view" of the bag from within the curtilage authorizing the seizure.

*Commonwealth v. English,* 839 A.2d 1136 (Pa. Super. 2003), is on point. There, police received an anonymous tip that the residents of a home were growing marijuana on their back porch. After the officers received no response to their knocks at the front door, which apparently were meant to be a knock and talk, they walked toward the back of the house through a neighbor's yard. From there they observed marijuana growing on English's back deck. They then knocked repeatedly on English's back door and again received no response. After unsuccessfully trying the front door again, they unlatched the deck gate, entered, and seized the marijuana plants. The officers then obtained a search warrant, which upon execution revealed drug paraphernalia.

On appeal, English challenged the trial court's denial of his suppression motion. The appellate court rejected his claim that the officers initially viewed the plants from an unlawful vantage point. It held that the plants were in an open area, without cover, on English's deck, clearly visible to anyone who cared to look that way. They could be seen not only from the neighbor's yard, but also from the road in front of the neighbor's house. 839 A.2d at 1139. In other words, the plants were openly observed.

The court accepted, however, English's alternative argument, that even if the initial observation was proper, the subsequent seizure of the plants without meeting the warrant requirement, or an exception thereto, was improper. It observed that "[w]hile it is clear that the plain view doctrine applied in this case to *validate the officer's initial observation* of the plants [from the lawful vantage

point and open view from the neighbors' yard], application of the doctrine did not authorize the *seizure* of the plants." 839 A.2d at 1140.

The *English* court drew distinctions between situations in which the view takes place after an intrusion into a constitutionally protected area and situations in which the view takes place before the intrusion. It concluded that in the situation involving a pre-intrusion view, the subsequent warrantless seizure of evidence cannot be justified by plain view alone:

"In those cases [after-intrusion view] because the justifiable intrusion already has occurred, no further intrusion is occasioned by the seizure of evidence which is in plain view and the seizure is permitted without more. . . . In the pre-intrusion view cases no intrusion is occasioned by the view and the intrusion necessary to seize evidence must be justified by a warrant or one of the exceptions to the warrant requirement." 839 A.2d at 1140.

The court determined that English's situation involved a preintrusion view. The officers first observed the marijuana from a lawful vantage point and at the time of that initial observation they had not intruded into the constitutionally protected area that held the plants—which it determined was curtilage (a deck enclosed by a fence and latched gate). It concluded that the officers were required to get a warrant in order to enter the defendant's deck or, in the alternative, to establish an applicable exception to the warrant requirement—besides plain view. 839 A.2d at 1141. The court impliedly held that under its facts, the "knock and talk" would not qualify as a justified intrusion leading to proper seizure under plain view. 839 A.2d at 1140-43.

We agree with the holding of the *English* court. We specifically disapprove of any State attempt to "piggyback," *i.e.*, to observe an object in open view from off the premises, to use knock and—in these cases, unsuccessful—talk for justified entry onto the premises, and then assert plain view while on the premises as a legal basis to seize the identical object that had been observed earlier. Such piggybacking under these facts would smear the careful distinctions drawn by the *Horton* Court between the right to merely observe an object (here, from off the premises) and the right to seize that object (on the premises). From a practical standpoint,

this piggyback practice would grant law enforcement the right to seize virtually any object initially observed from a distance and subsequently located within plain view of a residential doorway by an officer purposely looking for that identical object.

An additional reason for us to reject the State's request to apply the plain view doctrine for justification of the seizure is that Jager's premises search and seizure of the bag exceeded the scope of his justified intrusion. This rejection applies whether the State were to contend that the off-highway observation of the bag alone, the off-site smell of ether alone, the previous citizens' tips alone, or some combinations thereof, justified the knock and talk.

We acknowledge that the knock and talk allows officers to come within the curtilage to ask questions. See, *e.g.*, *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) ("officer may encroach upon the curtilage of a home for the purpose of asking questions"); *United States v. Daoust*, 916 F.2d 757 (1st Cir. 1990). We also acknowledge that if no one answers the knock, as here, the officers can be justified in knocking on more doors. *Hammett*, 236 F.3d at 1060 (where no one answered front door, officer properly "circled the house with the intent of locating another door"); see *Daoust*, 916 F.2d at 758.

We also acknowledge that, as here, while driving to and from the parking spot on the driveway, while walking to and from the front door, and while at the front door, the officer may make lawful observations. *State v. Tye*, 276 Ga. 559, 562-63, 580 S.E.2d 528 (2003) (officers justified under plain view doctrine when seizing blood-stained shoes being worn by man on his porch while officers interviewing him about murder of next-door neighbor); *State v. Hubbel*, 286 Mont. 200, 210, 951 P.2d 971 (1997) (police "well within their authority to proceed on the open walkway to the front door, where they saw yet more evidence in plain view"); *State v. Portrey*, 134 Or. App. 460, 465, 896 P.2d 7 (1995) ("Here, the officers, like any other person, were at liberty to observe all objects and activities from that vantage point at the front door."); *State v. Lodermeier*, 481 N.W.2d 614, 624 (S.D. 1992) (officer examination of exterior of garden tractor parked in driveway lawful, as "officer

with legitimate business may enter a driveway and, while there, may inspect objects in open view").

However, Jager did not have the run of the entire Fisher property. See *Rogers v. Pendleton,* 249 F.3d 279, 289 (4th Cir. 2001) (the right to knock and talk does not include the right to make a general investigation in the curtilage based on reasonable suspicion). As the court stated in *State v. Seagull,* 95 Wash. 2d 898, 902-03, 632 P.2d 44 (1981):

"It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. [Citation omitted.] An officer is permitted the same license to intrude as a reasonably respectful citizen. [Citation omitted.] However, *a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy."* (Emphasis added.)

Accordingly, any observations Jager made while exceeding the scope of his lawful intrusion into the curtilage are unlawful. See *People v. Thompson,* 221 Cal. App. 3d 923, 943, 270 Cal. Rptr. 863 (1990); *Clark,* 124 Idaho at 311-14 (although deputy was pursuing a legitimate police purpose by investigating a complaint of an excessively loud party and was therefore justified in entering the curtilage, his view through the corner window would still constitute an unlawful search if he unreasonably strayed from the normal access route to the front door); *Robinson v. Com.,* 47 Va. App. 533, 625 S.E.2d 651 (2006); see also *Gonzalez v. State,* 588 S.W.2d 355, 359-60 (Tex. Crim. App. 1979) (purported plain view search unconstitutional where after officer received no response to his knocks at front and back doors of defendant's residence to investigate tip about rifle shots, deviated from that route to search for game violations, followed a beaten path through back yard's tall grass, and explored weeded area near old outhouse which eventually revealed marijuana).

As a result, any seizure made while Jager was exceeding the scope of his lawful intrusion into the curtilage was also unlawful. *Cf. Horton v. California,* 496 U.S. at 140 ("If the scope of the search exceeds that permitted by the . . . character of the rele-

vant exception from the warrant requirement, the subsequent seizure is unconstitutional without more.").

There is little evidence in the record indicating that at the time Jager observed the bag while on the premises he was performing any legitimate functions, *i.e.*, observing while moving around the house exterior to look for another door or observing while on his way back to his vehicle after no one answered the knock. Admittedly, he testified at one point that he was "circling around to leave the property" when he observed the bag's contents. On this record, however, we find the evidence insufficient for the State to meet its burden that Jager did not exceed his lawful intrusion, *i.e.*, the knock and talk. As noted, we may make a factual determination from the record when neither lower court has addressed the issue, *e.g.*, in the absence of findings by the district court.

The weight of the evidence reveals that once Jager's knock and talk was complete, instead of driving away from the house to the highway, he simply drove deeper into the property on the driveway—according to the photographs, perhaps as much as 50 yards—directly to the previously observed bag. Once there, from his vehicle he noticed that it contained Actifed blister packs and, in confirmation of his earlier opinion, Heet bottles. He got out of the vehicle and seized the bag.

Indeed, the evidence in the record reveals that the county attorney had advised Jager before he ever entered the property that the bag was outside the curtilage and, as a result, he "could obtain the bag" without more. The record evidence reveals that instead of going directly to seize the bag, Jager wished to first conduct a knock and talk. Once that mission was unsuccessful, the only obstacle apparent to Jager before he seized the bag per the county attorney's advice had been eliminated. He drove on the driveway directly to the bag and seized it.

*State v. Ross*, 91 Wash. App. 814, 959 P.2d 1188 (1998), contains some parallels regarding exceeding the scope of the lawful intrusion. There, one deputy informed another of information obtained from an informant about a possible marijuana grow operation at a certain residential location in Tacoma. Later the deputy and another went to the residence. They parked on the street and walked

up the driveway toward the garage, located approximately 25-40 yards back from the street. One deputy detected the smell of growing marijuana emanating from the garage, and they left. They returned to the residence approximately 4 hours later, approached the garage in the same manner, and both smelled growing marijuana.

One deputy filed an affidavit of probable cause and obtained a search warrant for the garage, house, and vehicle. Upon execution of the search warrant, deputies found growing marijuana plants in the garage and house and packaged marijuana in the house. After the trial court denied the defendant's motion to suppress and convicted the defendant, the Court of Appeals reversed on the basis that the deputies had exceeded the scope of any implied invitation, *i.e.*, to investigate criminal activity. 91 Wash. App. at 819-22. Although the court looked at a number of different factors, among those upon which the court relied that are similar to those present in the instant case are (1) the discovery of the marijuana was not accidental, *i.e.*, the officers entered the property specifically to investigate an informant's tip about a marijuana grow operation, and (2) to reach the spot where they smelled the marijuana, they deviated nearly 10 feet from a direct route between their patrol car and the gate to the side path to the front door.

In light of these bases for our decision, we need not reach Fisher's argument about lack of exigent circumstances. Based on the above analysis, the district court and the Court of Appeals erred in upholding the bag seizure.

*Review of the excised affidavit*

Our analysis of the suppression issue does not end here, however. We now examine the validity of the search warrant's issuance based upon the remaining—and lawfully obtained—evidence. See *State v. Weas*, 26 Kan. App. 2d 598, 603, 992 P.2d 221, *rev. denied* 268 Kan. 895 (2000).

Fisher's motion to suppress, among other things, expressly alleged "[t]hat the facts upon which the search warrant is based are insufficient to form the basis of probable cause." The motion recited a number of Jager's affidavit paragraphs and for each, not

just the trash bag evidence, argued why the application failed to establish probable cause.

As mentioned, the district court conducted an evidentiary hearing and, among other things, received testimony from Jager. It then denied the motion, holding that the "totality of the circumstances" yielded probable cause. Based upon the district court's statements of record cited earlier in the opinion, the court's determination of probable cause appeared to be de novo. When reviewing a motion to suppress evidence, this court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. The ultimate determination of the suppression of evidence is a legal question requiring independent review. *State v. Horn,* 278 Kan. 24, 30, 91 P.3d 517 (2004).

However, the specific, narrower question within the district court's general determination of suppression—a magistrate judge's finding of probable cause to issue a search warrant—is reviewed under a different standard. See, *e.g., United States v. Hill,* 459 F.3d 966, 970 (9th Cir. 2006); *United States v. Conley,* 4 F.3d 1200, 1204-05 (3d Cir. 1993). As this court held in *State v. Hicks,* 282 Kan. 599, Syl. ¶ 2, 147 P.3d 1076 (2006), the correct standard of review is instead more deferential to the magistrate judge. The deference is owed by all reviewing courts, district and appellate. More specifically, the standard is whether the evidence provided the magistrate issuing the search warrant with a substantial basis for determining that probable cause existed. As the Supreme Court stated in *Illinois v. Gates,* 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983):

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation omitted.]"

As we explained in *Hicks,* when reviewing the issuing judge's decision to issue the warrant, we "conduct an independent analysis

of the content of the affidavit, but we need only see enough to persuade us that there was a substantial basis for the magistrate's conclusion." *Hicks*, 282 Kan. at 613. One justification for applying this standard, which is less rigorous than the de novo standard of review of reasonable suspicion and probable cause determinations underlying warrantless searches, is to provide law enforcement with an incentive to seek warrants. *Hicks*, 282 Kan. at 611 (citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 116 S. Ct. 1657 [1996]).

*Hicks* presents a different fact pattern than the instant case, however. It concerned a simple review of an affidavit for a search warrant issued by a magistrate judge. On the other hand, Fisher requires us to review an affidavit—found by a magistrate judge to sufficiently establish probable cause when in its complete form—but now with the unlawfully obtained evidence excised. A threshold question then arises whether we still apply the deferential standard of review articulated in *Gates* and *Hicks* to the magistrate's determination of probable cause or whether the excision factor mandates a different standard.

In Kansas, while Fisher's fact pattern has arisen previously, our appellate courts have not expressly considered whether a distinction is to be drawn. In *Weas*, 26 Kan. App. 2d 598, the court addressed law enforcement's warrantless entry into a house where the officers viewed drugs and paraphernalia at various locations. The officers then sought and obtained a search warrant which served as the basis for seizure of the items related to drugs as well as a sexual assault. Although the court held the warrantless entry was justified, it addressed an alternative basis for refusing to suppress the evidence seized:

"Assuming the application and affidavit for the search warrant contained information both lawfully and unlawfully obtained, the question remains whether the lawfully obtained information by itself supports probable cause that would have justified issuance of the search warrant by the magistrate." 26 Kan. App. 2d at 603.

After reviewing the remaining allegations in the affidavit—regarding the sexual assault—the Court of Appeals simply "conclude[d] beyond a reasonable doubt that the magistrate would have

issued a search warrant for the residence based upon the lawfully obtained information possessed by the police before the warrantless entry into the residence." 26 Kan. App. 2d at 604.

Similarly, in *State v. Wilson,* No. 95,028, unpublished Court of Appeals opinion filed August 18, 2006, a search warrant was issued on the basis of a marijuana pipe found in defendant's basement after a warrantless search, remnants of a meth lab found in a trash can behind the residence, and a chemical smell detected by the officers upon approaching the residence. Execution of the warrant resulted in the seizure of meth production and other drug-related evidence. Among other things, the Court of Appeals acknowledged that the smell of ether alone did not constitute probable cause, citing *State v. Blair,* 31 Kan. App. 2d 202, 62 P.3d 661 (2002). It concluded that if it found the officers legally obtained either the pipe or lab remnants, then it was required to determine whether such evidence, in conjunction with the chemical smell, provided a probable cause basis for the search warrant, citing *Weas. Wilson,* slip op. at 12-13.

The *Wilson* court held that because the pipe and trash can contents were illegally seized they could not have been used to establish probable cause: "Because other than an unidentified chemical smell no evidence remains to support the warrant, we conclude the district court did not err in finding the warrant was not supported by probable cause and in granting the defendant's motion to suppress." Slip op. at 24. As in *Weas,* the *Wilson* court did not express any distinctions to be drawn between the standards for reviewing a magistrate judge's consideration of excised versus unexcised affidavits.

Other jurisdictions are split on the standard for reviewing an excised affidavit. For example, Missouri courts expressly reject the *Gates* standard of giving deference to an initial judicial determination of probable cause in such circumstances. After reviewing Missouri case law, the court concluded in *State v. Mahsman,* 157 S.W.3d 245, 251 (Mo. App. 2004):

" 'Our ultimate inquiry is not whether the affidavits contained allegations based upon illegally obtained evidence but whether, if setting aside all tainted allegations, the independent and lawful information stated in the affidavits suffices to

show probable cause.' [Citation omitted.] *Where, as here, the appellate court must excise tainted information from the affidavit, probable cause is determined without the deference ordinarily given to the issuing judge's decision on an affidavit containing only untainted information.* [Citations omitted.]" (Emphasis added.)

The *Mahsman* court readily acknowledged, however, that its holding was based upon its reading of other Missouri cases where, without reference to a particular standard of review, the courts appeared to review excised affidavits de novo and without any deference to the issuing judge's determination. 157 S.W.3d at 251 n.2.

By contrast, Idaho appears to still apply the deferential standard. In *State v. Johnson,* 110 Idaho 516, 716 P.2d 1288 (1986), certain evidence was the result of an unlawful search and was therefore excised from the affidavit in support of a search warrant request. The court then "turn[ed] to the rest of the affidavit . . . to determine if it contains adequate facts by which the magistrate could have concluded that probable cause exists for issuance of the search warrant." 110 Idaho at 526. After discussing *Gates,* the court concluded:

"Thus, we hold, based upon [the remaining allegations in the affidavit], that *there was not a substantial basis* upon which the magistrate could have found that there was a fair probability that contraband would be found inside Johnson's home. '[G]iven all the circumstances set forth in the affidavit . . . ,' [*Gates,* 462 U.S. at 238,] we hold that there was insufficient evidence by which the magistrate could have found probable cause." (Emphasis added.) 110 Idaho at 527-28.

Unlike the Missouri court in *Mahsman,* Idaho apparently does not expressly consider the alternative standard of review—which in *Johnson,* would have been de novo. And neither jurisdiction provides a rationale for why it applies its particular standard over another.

We see no persuasive reason to depart from the *Gates* deferential standard and to embrace the de novo standard when examining an excised affidavit that had been considered in its complete form by a magistrate judge before issuing a search warrant. We therefore proceed to an analysis of the excised affidavit utilizing the deferential standard as articulated in *Hicks*:

"In determining whether probable cause exists to support a search warrant, the task of the issuing magistrate is simply to make a practical, common-sense decision

whether, given all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of any persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

"When an affidavit in support of an application for search warrant is challenged, the task of the reviewing court is to ensure that the issuing magistrate had a substantial basis for concluding probable cause existed. This standard is inherently deferential. It does not demand that the reviewing court determine whether, as a matter of law, probable cause existed; rather, the standard translates to whether the affidavit provided substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched." *Hicks*, 282 Kan. 599, Syl., ¶¶ 1, 2.

According to Fisher's motion to suppress, the application and supporting affidavit of Jager—now absent the contents of the wrongfully seized bag—are summarized as follows:

Paragraph six: A concerned citizen stated that the property residents were burning trash outside; it was not the typical trash-burning smell, and it had a peculiar smell. He then became suspicious and started paying closer attention to the residence. The concerned citizen also stated that several vehicles came and went from the residence, staying a short time.

Paragraph eight: Another unidentified concerned citizen stated that between August 26, 2001, and August 28, 2001, a blue and silver conversion van arrived at the residence. A white female was driving the van and parked it by the shed. A white male came out of the residence and met with the female. The two moved some boxes from the van into the shed.

Paragraph nine: While in an open field next to the residence, officers noticed a strong smell of ether coming from the area west of the shed.

Paragraph ten: Apparently on the same day, affiant Jager went back to the property and saw a white trash bag sitting along the side of the west shed (barn). Jager stated that the bag was approximately 50-60 yards away from the main residence, next to the shed and a trash container. With the use of binoculars, Jager could see yellow bottles in the trash bag that were the same shape and size as Heet bottles.

We will consider the allegations in a different order than which they appear in the application and accompanying affidavit.

First, officers at the scene noticed a strong smell of ether. As correctly found by the district court, ether is a substance commonly used in the manufacture of methamphetamine. See *State v. Blair*, 31 Kan. App. 2d 202, 207-08, 62 P.3d 661 (2002). It is often derived from household items such as starter fluid. See *State v. Gunn*, 29 Kan. App. 2d 337, 338, 26 P.3d 710, *rev. denied* 272 Kan. 1421 (2001); *State v. Bowles*, 28 Kan. App. 2d 488, 490, 18 P.3d 250 (2001). Because ether has legitimate household purposes, and is not illegal to possess, it has been held that the smell of ether alone cannot establish probable cause. See *Blair*, 31 Kan. App. 2d at 208. It may be considered with other evidence, however, in the totality of the circumstances for determining whether probable cause exists. See *United States v. Nation*, 243 F.3d 467, 470 (8th Cir. 2001); *Mahsman*, 157 S.W.3d at 252. As the *Nation* court stated: " '[I]nnocent behavior frequently will provide a showing of probable cause.' " 243 F.3d 470 (citing *Gates*, 462 U.S. at 243 n.13).

Second, Jager noticed yellow bottles in a trash bag that were the same shape and size as Heet bottles. As the district court correctly found, Heet—comprised of methanol—can be an ingredient in the manufacture of methamphetamine. See *State v. LaMae*, 268 Kan. 544, 547, 998 P.2d 106 (2000) ("ingredients [ephedrine or pseudoephedrine] are separated from the binder material in the [cold] tablets by adding a liquid solvent such as Naptha or methanol such as that found in Heet antifreeze"). Admittedly the bottles were not immediately identified with absolute certainty as Heet bottles. However, their likely identification by a law enforcement officer—who at virtually the identical location, *i.e.*, the barn, hours earlier had noticed the strong smell of ether, another known ingredient of methamphetamine manufacturing—is a circumstance to be considered in the probable cause analysis. *Cf. Nation*, 243 F.3d at 469-70 (storage of certain legal items together, *e.g.*, starter fluid [ether], coffee filters, and plastic and glass containers, raised sufficient suspicion of criminal activity to support a finding of probable cause).

Like starter fluid, Heet has uses besides methamphetamine manufacturing, *i.e.*, its labeled and well-known purpose is to pre-

vent gas-line freeze in vehicles. Here, however, the viewing of the bottles in a trash bag—which suggests they had been used—occurred on an August day in Kansas. As a result, it is less likely they had been opened and used to prevent gas-line freeze and more likely used to manufacture methamphetamine. See *Gates*, 462 U.S. at 238 ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

In sum, Jager's personal perceptions within hours of each other at the same place—observing used Heet bottles in August and smelling a strong odor of ether—create a significant degree of suspicion that methamphetamine was being manufactured at that location. See *Gates*, 462 U.S. at 243-44 n.13 ("In making a determination of probable cause, the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.").

Third, a concerned citizen's notice of a peculiar smell when the property residents were burning trash. The affidavit provided that "[h]e then became suspicious and started paying *closer attention* to the residence." The affidavit concluded: "The concerned citizen also stated that several vehicles came and went from the residence, staying a short time."

The two informants were unidentified. This is not fatal to the probable cause determination, however. As the Court stated in *Gates*, which involved an anonymous informant:

"[An] informant's 'veracity' or 'reliability' and his 'basis of knowledge' . . . are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: *a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.* [Citations omitted.]" (Emphasis added.) 462 U.S. at 233.

Accordingly, as our Court of Appeals interpreted in *State v. Shively*, 26 Kan. App. 2d 302, 306, 987 P.2d 1119 (1999), *aff'd*, 268 Kan. 589, 999 P.2d 259 (2000):

"When an affidavit is founded upon information from an unidentified informant, its validity is not controlled by the reliability of the unidentified informant. *State v. Sidel*, 16 Kan. App. 2d 686, 692, 827 P.2d 1215, *rev. denied* 250 Kan. 807 (1992). The probable cause determination *must be supported by some indication that the informant's information is accurate. Sidel*, 16 Kan. App. 2d at 692. *Therefore, the veracity and basis of knowledge of the [informant] must be considered as part of the substantial basis for finding probable cause."* (Emphasis added.)

The magistrate is allowed "to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant." *Gates,* 462 U.S. at 240. The magistrate could have easily inferred that the citizen's paying "attention to the residence" meant personal observation of the vehicles coming and going. Personally sensed information supports the "basis of knowledge" described in *Gates.* See *Shively,* 26 Kan. App. 2d at 307 (informant based his knowledge upon first-hand perception); *State v. Rose,* 8 Kan. App. 2d 659, 663, 665 P.2d 1111, *rev. denied* 234 Kan. 1077 (1983) (among other things, informant personally observed the contraband in house). Likewise, the concerned citizen's paying *"closer attention to the residence"* could be inferred by the magistrate as an indication of the citizen's personal awareness of the earlier peculiar smell of the trash.

The magistrate could have also reasonably inferred that the concerned citizen's notice of a peculiar smell, albeit apparently of burning trash, was in some measure later corroborated by law enforcement's strong smell of ether on the premises, which has a distinct, if not "peculiar" smell. Contrast *Rose,* 8 Kan. App. 2d at 663-64 (occurrence of prior criminal activity was verified by law enforcement officers, so this verification supplied an indicia of reliability to that informant's tip) with *Hicks,* 282 Kan. at 615-16 (there is nothing in the affidavit that told the magistrate the police observed any activities that would corroborate the citizens' complaints), and *State v. Lum,* 27 Kan. App. 2d 113, 120-21, 998 P.2d 137, *rev. denied* 269 Kan. 938 (2000) (affidavit contains nothing supporting the accuracy of the officer's source or sources, nor is there showing of independent corroborating evidence to establish reliability).

Fourth, law enforcement corroboration of part of the concerned citizen's story—the peculiar smell—also suggests the reliability of

the remainder of his personally sensed information, *i.e.*, the observation of vehicles coming and going and staying for a short time at the residence. As the Court stated in *Gates*, 462 U.S. at 244-45:

" 'Because an informant is right about some things, he is more probably right about other facts,' [citation omitted] . . . This may well not be the type of 'reliability' or 'veracity' necessary to satisfy some views of the 'veracity prong' of *Spinelli* [*v. United States*, 393 U.S. 410 (1969)] but we think it suffices for the practical, common-sense judgment called for in making a probable-cause determination. It is enough, for purposes of assessing probable cause that '[c]orroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting hearsay.' [Citation omitted.]"

Moreover, the concerned citizen's "paying *closer* attention" after the peculiar smell suggests increased reliability for the vehicle observations. And the level of traffic is considered a factor in the probable cause determination. *Cf. State v. Norville*, 23 S.W.3d 673, 683 (Mo. App. 2000) (unusually heavy traffic at the mobile home); *State v. Meyers*, 992 S.W.2d 246, 248 (Mo. App. 1999) (vehicles at the residence at all hours of the night). Short visits to a property are also a factor in the determination. See *United States v. Hernandez Leon*, 379 F.2d 1024, 1028 (8th Cir. 2004) (officer's observation of short-term visitors a factor); *United States v. Gibson*, 928 F.2d 250, 253 (8th Cir 1991) ("nor were there very short visits characteristic of drug trafficking"); *State v. Paige*, 934 So. 2d 595, 600 (Fla. Dist. App. 2006) (report of short stays of vehicular traffic from a concerned citizen one factor).

Fifth, a concerned citizen's notice of a van arriving at the property, and the unloading of boxes from the van to the shed, cannot be reliably considered. Unlike the other unidentified concerned citizen, there is no corroboration or other suggestion of reliability.

We are mindful of the Supreme Court's direction that a deficiency in either an informant's (1) veracity or reliability or (2) his or her basis of knowledge may be compensated for, in determining the *overall* reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. See *Gates*, 462 U.S. at 233. We are also mindful of the Third Circuit Court of Appeals' statement in *Conley:*

"The Supreme Court has directed that 'although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.*" (Emphasis added.) *Conley,* 4 F.3d at 1205 (citing *United States v. Ventresca,* 380 U.S. 102, 109, 13 L. Ed. 2d 684, 85 S. Ct. 741 [1965], quoted with approval in *Gates,* 462 U.S. at 237 n.10).

Accordingly, after looking at the totality of these circumstances presented to the magistrate, we hold that he had a substantial basis for concluding that a crime had been or was being committed, and there was a fair probability that contraband or evidence of a crime would be found in the places to be searched. Therefore, even absent evidence of the contents of the trash bag, the search warrant was valid. The district court was correct in denying the motion to suppress, albeit for a somewhat different reason. See *State v. Bryant,* 272 Kan. 1204, 1210, 38 P.3d 661 (2002) (trial court will not be reversed if it is right, albeit for the wrong reason).

Issue 2: *The district court's admission of hearsay did not violate Fisher's right to confrontation under the Sixth Amendment to the United States Constitution.*

Fisher next argues that the district court erred in admitting statements made by David Holden who did not testify at trial. He claims that his right to confrontation under the Sixth Amendment was denied, citing *Crawford v. Washington,* 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). The State suggests that Fisher invited the error because he initiated the testimony, citing *State v. Hebert,* 277 Kan. 61, 78, 82 P.3d 470 (2004).

The Court of Appeals sharpened the focus by holding that Fisher waived his confrontation right by opening the door to otherwise inadmissible testimony, citing *State v. Johnson,* 258 Kan. 475, 481, 905 P.2d 94 (1995). As we agree with the Court of Appeals, our usual analysis of admissibility, *e.g.,* relevance, is unnecessary.

While officers were at the Fisher residence, David Holden arrived with Fisher. Agent Smith interviewed Holden. At trial, Agent Smith testified about Holden's statements. The court also admitted Holden's written statement dated August 30, 2001. Holden was not present to testify.

At trial, a discussion of Holden was first initiated by defense counsel on cross-examination of Detective Jager:

"Q. [By defense counsel] Did you talk to Mr. Holden?
"A. [By Detective Jager] No, sir, I did not.
"Q. Did you receive information of what Mr. Holden told Agent Smith?
"A. I received a written statement from Agent Smith, yes, sir.
"Q. That night when Mr. Holden was there and gave that statement to Mr. Smith, was there something in that statement that Mr. Holden said that was obviously not true?
"A. Not to my knowledge, sir.
"Q. Do you have the statement?
"A. Yes, sir, I do.
. . . .
"Q. So if Mr. Holden told the officer that Greg Fisher had ten grams and actually had two, that wouldn't be true; would it?
"A. I don't know if I can argue that, sir.
"Q. I'm just asking you that's obviously what happened and I want to know if you considered that before you decided to target Mr. Fisher as the cook?
"A. I don't quite understand your line of questioning, sir.
"Q. Sometime you came to the conclusion that Mr. Fisher was the cook?
"A. Yes, sir.
"Q. Was it something that Mr. Holden told you?
"A. No, sir."

On defense counsel's re-cross of Detective Jager, he further inquired about Holden's statement:

"Q. County Attorney asked you if you found anything in the house that indicated somebody else might be living there, but did you learn that Mr. Holden had been living there for awhile?
"A. No, sir, I did not.
"Q. Mr. Holden gave a statement; right?
"A. Yes, sir.
"Q. In his statement, he stored some of his personal property in the garage; did he not?
"Mr. Wilkerson [State]: Your Honor, I'm going to object. Mr. Holden is not here.
"The COURT: Overruled.
. . . .
"Q. Have you been able to locate the statement?
"A. Yes, sir, I have.
"Q. And in his statement he—he said he stored some things there?
"A. Yes, sir.
"Q. And he lived there in the past?

"A. Yes, sir. Not lived but stayed.
. . . .
"Q. Does his statement admit that he's used drugs and possessed drugs?
"A. I believe so. He stated that he consumed."

During the State's later direct examination of Agent Smith, the prosecutor questioned him regarding Holden's statements. Over defense counsel's objection, Holden's written out-of-court statement was admitted in its entirety.

This record reveals that Fisher did indeed open the door to the evidence about Holden's information. As the Court of Appeals pointed out, *State v. Johnson* controls:

"In *State v. Johnson*, 258 Kan. 475, the Kansas Supreme Court was presented with a somewhat similar factual situation. In *Johnson*, defense counsel, on cross-examination, questioned a witness regarding out-of-court statements made by a declarant who did not testify at trial. The purpose of the questioning was to shift the focus from the defendant to the testifying witness as the accomplice to the crime. The Supreme Court held: 'We have recognized that when a defendant opens an otherwise inadmissible area of evidence during the examination of witnesses, the prosecution may then present evidence in that formerly forbidden sphere. [Citations omitted.] By opening the door to otherwise inadmissible hearsay, a defendant waives the Sixth Amendment right to confrontation.' 258 Kan. at 481." *Fisher*, slip op. at 13-14.

Although *Crawford v. Washington* postdates *Johnson,* since *Crawford* we have held that a defendant may forfeit his or her right to confrontation and waive any hearsay objections. See *State v. Meeks,* 277 Kan. 609, 614-16, 88 P.3d 789 (2004). Accordingly, we conclude that the district court did not err in admitting Holden's statements.

Issue 3: *Fisher's convictions for possession of ephedrine and paraphernalia are not multiplicitous with his conviction for manufacture of methamphetamine*

Finally, Fisher asserts that his convictions for manufacture of methamphetamine (K.S.A. 65-4159), possession of ephedrine (K.S.A. 65-7006), and possession of drug paraphernalia (K.S.A. 65-4152[a][3]) are multiplicitous. Specifically, he claims that the latter two are lesser included offenses of manufacturing under K.S.A. 2006 Supp. 21-3107(d)(2). Because our analysis is guided by our recent decision in *State v. Schoonover,* 281 Kan. 453, 133 P.3d 48

(2006), it is unnecessary to review the details of the parties' arguments and the Court of Appeals' approach to the multiplicity issue, all of which predated *Schoonover.* "[W]hether convictions are multiplicitous is a question of law subject to unlimited review." 281 Kan. at 462; *State v. Stevens,* 278 Kan. 441, 446, 101 P.3d 1190 (2004).

We have stated that multiplicity is the charging of a single offense in several counts of a complaint or information. *State v. Kessler,* 276 Kan. 202, 204, 73 P.3d 761 (2003). The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense. Multiple punishments for a single offense are prohibited by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and by §10 of the Kansas Constitution Bill of Rights. 276 Kan. at 205.

In *Schoonover,* we announced an analytical framework which applies when the issues arise from cumulative punishments imposed in one case. We held:

"In considering a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and [if so] (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496.

We elaborated on the first component:

"If the conduct is discrete, *i.e.*, committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense." 281 Kan. at 496.

There, we listed several factors to be considered in determining if conduct is unitary, *i.e.*, if it is the same conduct. They include (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct. 281 Kan. at 497.

Under the first step of the double jeopardy analysis, we must determine whether Fisher's convictions arise from the same con-

duct. In applying the factors identified in *Schoonover*, we observe that the acts upon which the complained-of offenses are based were discovered in one house by law enforcement during execution of a search warrant on one occasion. Additionally, there is no evidence in the record to suggest the presence of an intervening event in the production cycle or a fresh impulse motivating a new manufacturing process. See *Schoonover*, 281 Kan. at 499. We conclude that the conduct in the instant case was unitary, *i.e.*, constituted one transaction.

Accordingly, we advance to the second component of the analysis, which requires us to determine whether, by statutory definition, there are multiple offenses or only one. Because the double jeopardy issue in the instant case arises from multiple convictions for violations of different statutes, the multiple description test is applied. *Schoonover*, 281 Kan. at 497. In Kansas, that test is the same-elements test. As we stated in *Schoonover*, "the test to determine whether charges in a complaint or information under different statutes are multiplicitous is whether each offense requires proof of an element not necessary to prove the other offense; if so, the charges stemming from a single act are not multiplicitous." 281 Kan. at 495.

At the time the offenses were committed, K.S.A. 2001 Supp. 65-4159(a) governed the unlawful manufacture of methamphetamine. The statute stated in pertinent part: "Except as authorized by the uniform controlled substances act, it shall be unlawful for any person to manufacture any controlled substance or controlled substance analog."

K.S.A. 2001 Supp. 65-7006(a) governed the unlawful possession of ephedrine or pseudoephedrine. The statute stated: "It shall be unlawful for any person to possess ephedrine, pseudoephedrine or phenylpropanolamine, or their salts, isomers or salts of isomers with intent to use the product as a precursor to any illegal substance."

Finally, K.S.A. 2001 Supp. 65-4152(a)(3) governed the unlawful possession of drug paraphernalia. The statute stated in pertinent part: "No person shall use or possess with intent to use . . . any drug paraphernalia to plant, propagate, cultivate, grow, harvest,

manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, sell or distribute a controlled substance in violation of the uniform controlled substances act."

In *Schoonover,* this court addressed, and rejected, the identical multiplicity arguments advanced by Fisher concerning the identical statutory offenses.

For alleged multiplicity of manufacturing methamphetamine and or possessing ephedrine or pseudoephedrine, we stated:

"Manufacturing methamphetamine requires proof of manufacturing or the ability to manufacture, while possession of ephedrine or pseudoephedrine does not. Possession of ephedrine or pseudoephedrine requires proof of possession of that substance while manufacturing does not. Compare K.S.A. 65-4159 with K.S.A 65-7006(a). The elements differ; therefore, there is no double jeopardy violation." 281 Kan. at 500-01.

For alleged multiplicity of manufacturing methamphetamine and possessing drug paraphernalia with intent to manufacture, we stated:

"A conviction for possession of drug paraphernalia shares a common element with a conviction of manufacturing methamphetamine, *i.e.*, the intent to manufacture. However, each offense proscribes other, distinct conduct. Compare K.S.A. 65-4159 with K.S.A. 65-4152. Therefore, the crimes are not multiplicitous and there is no double jeopardy violation. See *Patten,* 280 Kan. at 393." 281 Kan. at 501.

More specifically, "[t]he crime of manufacture of methamphetamine requires proof of the manufacture of methamphetamine, which is not required in proving possession of drug paraphernalia. The crime of possession of drug paraphernalia requires proof of possession of drug paraphernalia, which is not required in proving manufacture of methamphetamine." *State v. Patten,* 280 Kan. 385, 391, 122 P.3d 350 (2005).

The Court of Appeals, although holding Fisher's *convictions* were not multiplicitous, held that under *State v. McAdam,* 277 Kan. 136, 142-47, 83 P.3d 161 (2004) (person convicted of K.S.A. 65-4159[a] could be sentenced only under the lesser penalty of K.S.A. 65-4161[a]), *State v. Barnes,* 278 Kan. 121, 129, 92 P.3d 578 (2004) (*McAdam* rule applies to cases pending on direct appeal as of the date of *McAdam* decision), and *State v. Campbell,* 279

Kan. 1, 16-17, 106 P.3d 1129 (2005) (person convicted of K.S.A. 65-7006[a] could be sentenced only under the lesser penalty of K.S.A. 65-4152[a][3]), the *sentences* for unlawful manufacture of methamphetamine and possession of ephedrine should be vacated, and the matter should be remanded for resentencing consistent with *McAdam* and *Campbell*. The State does not oppose, and we agree.

The decision of the Court of Appeals affirming the district court in part is affirmed. The decision of the district court is affirmed in part, vacated in part, and remanded for resentencing as instructed in the opinion.

LOCKETT, J., Retired, assigned.

DAVIS, J., concurring: I concur in the result of the majority decision affirming the validity of the search warrant issued for the defendant's premises but disagree with the reason for its decision. I also concur in every other respect with the remainder of the majority decision.

The majority holds that the seizure of the trash bag by Officer Jager violated the defendant's constitutional rights under the Fourth Amendment to the United States Constitution and then, absent the evidence from the trash bag set forth in the affidavit for search warrant, holds that the remainder of evidence mentioned in the affidavit was sufficient to establish probable cause for the search and seizure of items from the defendant's house and premises. According to the majority opinion, we may ignore the constitutional violation of defendant's rights if the remaining evidence in the affidavit establishes probable cause. While this may be the case, I think it important to examine the basis for the search warrant presented to the district court. Contrary to the majority opinion and consistent with the trial court and the Court of Appeals, I would conclude that Officer Shane Jager's seizure of the trash bag

based upon the plain view exception to the warrant requirement did not violate the defendant's constitutional rights.

The ultimate issue in this case involves the validity of a search warrant issued for defendant's residence at 12420 Highway 63, Emmett, Pottawatomie County, Kansas. There can be no argument that the information contained in the affidavit for search warrant including the contents of the trash bag is more than sufficient to provide probable cause for the search. See *State v. Hicks*, 282 Kan. 599, Syl. ¶¶ 1, 2, 147 P.3d 1076 (2006). However, in my opinion the evidence obtained from the trash bag seized by Officer Jager on defendant's premises provided crucial information supporting the probable cause determination for the search in question.

Defendant moved to suppress the contents of the trash bag seized on the basis that the seizure violated his rights under the Fourth Amendment to the United States Constitution. While approving the search warrant, the majority holds that the seizure of the trash bag by Officer Jager violated the defendant's Fourth Amendment rights under the United States Constitution and the Kansas Constitution Bill of Rights, § 15. Since the district court in this case based its decision for granting a search warrant upon the affidavit including evidence seized in the trash bag, which according to the majority amounted to an unconstitutional seizure in violation of the defendant's rights, I believe it is important to examine the majority's conclusion that seizure of the trash bag violated the defendant's constitutional rights.

I respectfully disagree with the conclusion that seizure of the trash bag violated the defendant's rights under the Fourth Amendment and would conclude that Officer Jager, in what amounted to an excellent investigation of a clandestine methamphetamine lab, had the right under the "plain view doctrine" to seize the trash bag in question, thereby providing probable cause for a search and seizure of evidence on the defendant's premises.

The majority correctly sets forth our standard of review for a motion to suppress evidence. We review the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard of review. This court will not reweigh the

evidence. The ultimate determination of a suppression of evidence is a legal question requiring independent review. *State v. Horn,* 278 Kan. 24, 30, 91 P.3d 517 (2004).

In my opinion, the legal conclusion of the majority opinion is contrary to the facts as developed during the suppression hearing. Officer Jager was the only witness called at this hearing, and based on his testimony, the trial court concluded that the seizure of the bag, with its contents, was lawful.

The facts in this case are important, so I outline them here with some elaboration later in this dissent to support my conclusions. After a recitation of facts, I will set forth the precise ruling of the trial court on the conclusion of the suppression hearing.

Officer Jager had been employed with the Pottawatomie County Sheriff's Department for a little over 8-½ years. At the time, he was assigned to the investigation division, the detectives' division. He had experience in the field of narcotics and had also attended the federal Drug Enforcement Administration school for drug investigations. He also attended several Kansas Bureau of Investigation schools involving narcotic investigations and had completed a course in Quantico, Virginia, concerning the operation of clandestine methamphetamine labs. At the conclusion of this course, Officer Jager was certified as an officer capable of recognizing clandestine labs and how to safely dismantle them.

Prior to any investigation, Officer Jager received information from Deputy Sheriff Hoyt on information Hoyt had received from a concerned citizen. The citizen related that he noticed a strong, peculiar smell from trash being burned at defendant's residence, 12420 Highway 63, which caused the citizen to begin watching the traffic coming and going from this residence. He related that there were numerous cars coming and going from the residence, which was located in a rural area with few homes nearby. The cars would stay for a short period of time and then leave the residence.

Based upon his experience from working drug cases and from his training and schooling, Officer Jager suspected that such activity may indicate the sale or distribution of controlled substances, for normally that kind of traffic can indicate the buying and selling of

drugs, particularly where there are short visits with a quick "in and out" of the cars frequenting the premises.

Deputy Hoyt had received further information he related to Officer Jager that a gray and silver or silver and blue van had been coming and going from the residence. Another citizen had seen a white female pull into the driveway and go to the shed on the property, empty some boxes, and then put some more boxes in the van and leave the area. The female was later identified.

After receiving the above information, Officer Jager, Sergeant Chris Schmidt, and Deputy Shane Van Meter of the sheriff's office went to the property north of 12420 Highway 63, which is a large grass field, walked within 30 yards of a west shed, located on the defendant's property some 50 to 60 yards from the house, and smelled a strong odor of ether—enough to overcome Officer Jager. The officers then left the area. Officer Jager, through his training and experience as a law enforcement officer, knew that ether was used in the manufacture of methamphetamine. This information, together with the previous information concerning vehicles coming and going from the residence, suggested to him that the manufacture of methamphetamine and the sale of methamphetamine may have been taking place there.

The next morning, Officer Jager returned and stopped at a location south and east of the residence on Highway 63. Looking through binoculars and through plain eye sight, the officer observed a burn barrel and also saw through his binoculars that there were yellow containers in a trash bag located on the premises. He was aware that the containers looked similar to Heet bottles, which are commonly used in the manufacture of methamphetamine. He again smelled ether and decided to make contact with the residents at 12420 Highway 63. Officer Jager testified at the suppression hearing as follows:

"In my—At that time I was driving a Ford Explorer as a patrol vehicle. I pulled my patrol vehicle in the driveway, went to the front door, knocked on the door several times. [After no answer,] I got back in my vehicle and there's a circle driveway that goes around the back side of the residence there, got in, drove by. When I was driving by the white trash bag I noticed Actifed blister packs, several Heet bottles, and—and that's when I collected the white trash bag.

"Q. [County Attorney:] Were you outside of your vehicle when you saw the ephedrine?
"A. No, sir, I was not."

The trash bag was taken back to the sheriff's department and examined more closely. It was determined that the bag contained information identifying the renters of the residence, as well as further evidence indicating that the manufacture of methamphetamine was taking place on the premises.

Upon the conclusion of the suppression hearing, the trial judge observed and ruled as follows:

"All right. The test that the Court must use when issuing a search warrant is the totality of the circumstances. You don't isolate individual things. You take all those observations, all that knowledge that law enforcement acquires and together you observe or determine whether there's probable cause. A law enforcement officer doesn't have to prove guilt. This is merely probable cause, suspicion to believe, reasonable suspicion.

"Here we had a report by a concerned citizen of a smell that was a strange smell to be associated with the burning of trash. Officers then went to an open field and observed from that field a trash bag that had bottles in it, yellow, that were consistent with ether Heet bottles, which is a known ingredient of the manufacturing of methamphetamine. And he smelled an odor consistent with ether, which is also a known substance with the manufacturing of methamphetamine. They then received a report that there was a lot of traffic that would come and go at night, which is consistent with drug trafficking at the residence. This is known to law enforcement. Ultimately, the officers went to the house to inquire. *They had a right to be there. They have a right to go to the house and knock and talk to the occupants when they have that kind of information.* They weren't trespassing at [that] point; and even if they were, this is not trespassing in the constitutional sense. It's a common law trespass, but it doesn't constitute an invasion of privacy when they went to that residence. The contents of that plastic trash bag, which wasn't protected from rural—this wasn't curtilage as I see it and under these facts. The Heet bottles that became readily apparent, as did—I don't know what you call them.

"MR. WORKS: Pseudoephedrine.

"SHANE E. JAGER, Detective with Pottawatomie County Sheriff's Department: Blister packs, sir.

"THE COURT: Which are a known precursor for the manufacturing of methamphetamine. They had a right to take the trash, and what they found was further consistent with the process of manufacturing methamphetamine, specifically the coffee filters with the pinkish, powdery residue. These are consistent with items in manufacturing methamphetamine.

*"The Court does not believe the defendant's rights were violated in this case, and the Motion to Suppress will be denied."* (Emphasis added.)

The majority opinion spends a great deal of time on the question of whether the trash bag seized was within the curtilage of the property. In addition, the majority spends a great deal of time on whether the trash bag retained Fisher's expectation of privacy. I believe the question of curtilage could be resolved either way in this case, and I do not take issue with the majority's resolution that the trash bag was within the curtilage. While I disagree with the majority's conclusion that the trash bag retained Fisher's "expectation of privacy," particularly in view of the fact that the bag could be seen from the highway and the residents choose to use a translucent bag for the contents, I do not, however, find this issue dispositive.

I do not believe the majority's resolution of either issue affects the ultimate resolution of this case as to whether the seizure of the trash bag violated the defendant's constitutional rights under the Fourth Amendment to the United States Constitution. The critical question in my mind is whether seizure of the trash bag was justified by the plain view doctrine.

The majority decision rejects the plain view doctrine as a justification for the seizure of the bag, drawing a distinction between the plain view doctrine and what other courts have denoted the "open view doctrine." The majority defines the "open view doctrine" as referring to a law enforcement officer's observation of incriminating evidence or unlawful activity from a nonintrusive vantage point. The majority correctly concludes that, unlike mere observations made under "open view," the phrase "plain view" refers to seizures, not searches; it deals with "circumstances in which an officer has already justifiably intruded into a constitutionally protected area and then spots and removes incriminating evidence," citing Wallin, *Plain View Revisited*, 22 Pace L. Rev. 307, 325 (2002). The majority concludes, in short, absent a justifiable intrusion onto defendant's curtilage, the mere observation of the bag from the highway does not itself justify the bag's seizure. *Fisher*, 283 Kan. at 297. I agree with this conclusion.

However, I believe the majority lapses into error by holding "the open observation of the bag from the highway—which led to the knock and talk—cannot also serve as a 'plain view' of the bag from within the curtilage authorizing the seizure." 283 Kan. at 294. The majority relies heavily upon *Com. v. English*, 839 A.2d 1136 (Pa. Super. 2003), as a case in point for its conclusion.

In *English*, the police received an anonymous tip that the residents of a home were growing marijuana on their back porch. After the officers received no response to their knock at the front door, which apparently was meant to be a "knock and talk," they walked toward the back of the house through a neighbor's yard. From there, they observed marijuana growing on English's back porch. The officers knocked repeatedly on English's back door and again received no response. After unsuccessfully trying the front door again, they unlatched the deck gate, entered, and seized the marijuana plants. The officers then obtained a search warrant.

On appeal, the Pennsylvania appellate court noted that the officers previously viewed the growing marijuana plants from the neighbor's yard before they entered onto English's property. Under those circumstances, the appellate court reversed, reasoning that "[w]hile it is clear that the plain view doctrine applied in this case to validate the officer's initial observation of the plants [from a lawful vantage point of the neighbor's yard and in open view from the neighbor's yard], application of the doctrine did not authorize seizure of the plants." 839 A.2d at 1140. The *English* court then observed that the officers "pre-intrusion view" from the backyard of the neighbor's house did not justify entry into English's backyard or authorize a seizure of the marijuana plants. The majority here concludes that the *English* court impliedly held under its facts that the knock and talk would not qualify as a justified intrusion leading to proper seizure under plain view. See 839 A.2d at 1140-43.

Based upon *English*, the majority states:

"We specifically disapprove of any State attempt to 'piggyback,' *i.e.*, to observe an object in open view from off the premises, to use knock and—in these cases, unsuccessful—talk for justified entry onto the premises, and then assert plain view while on the premises as a legal basis to seize the identical object that had been observed earlier. Such piggybacking under these facts would smear the careful

distinction drawn by the *Horton* Court between the right to merely observe an object (here, from off the premises) and the right to seize that object (on the premises). From a practical standpoint, this piggyback practice would grant law enforcement the right to seize virtually any object initially observed from a distance and subsequently located within plain view of a residential doorway by an officer purposely looking for that identical object." 283 Kan. at 295-96.

I agree that *English* was correctly decided by the Pennsylvania court. However, I disagree that this case is in point. In light of the present facts before this court, *English* provides no support for the majority's conclusion. The officers in *English*, from a preintrusion view from the neighbor's backyard, saw marijuana growing. At that point, the officers had probable cause to obtain a search warrant. Instead, however, they elected to knock and talk, view the same growing marijuana again, and seize the marijuana, attempting to justify this seizure on the basis of the plain view doctrine. That is not what happened in this present case.

From Officer Jager's preintrusion view, he saw through binoculars what appeared to be containers in which one would find Heet. Yet, as was indicated by the officer's testimony at the suppression hearing, he could not specifically identify the bottles from that distance. In the defense counsel's cross-examination of Officer Jager, the following exchange took place:

"Q. So you pulled in some place south of the road?
"A. Correct.
"Q. And how far down the road to the south was that?
"A. I wouldn't be able to guess. It wasn't very far.
"Q. I mean, fifty yards?
"A. At the most, yes, sir.
"Q. And that's when you said you saw the trash bag out by the trash can, between the house and the shed?
"A. Correct sir.
"Q. And that's when you said you could see with your binoculars the containers in the trash bag?
"A. Correct, sir.
"Q. But you couldn't see what type of containers?
"A. Correct, sir.
"Q. And you couldn't see any Actifed or any other indicia at that point?
"A. Not at that point, no, sir."

Thus, what Officer Jager observed from the preintrusion view was merely another suspicious circumstance in the course of the investigation. All of the previous circumstances described above, together with what appeared in the binocular view to be similar to Heet containers, allowed Officer Jager to knock and talk in order that he might continue his investigation into these suspicious circumstances. Clearly, the actions and testimony of the officer indicate that he did *not* determine that his preintrusion view provided a basis for a plain view exception to the search warrant requirement.

We simply do not have a "piggyback" situation in this case. The officer's observation with binoculars merely increased his suspicion that containers in the trash bag were Heet bottles, but he could not tell from that distance what the bottles actually were. This case is therefore more analogous to another opinion cited by the majority—*United States v. Hammett*, 236 F.3d 1054 (9th Cir. 2001). In that case, law enforcement officers participated in a marijuana eradication mission on the Island of Hawaii. The officers acted as " 'spotters,' " searching for marijuana plants, from a government-employed helicopter. While flying at an altitude of approximately 500 feet, the officers noticed a distinct green color beneath a translucent roof of Hammett's residence which, in their experience, indicated the presence of marijuana plants. To investigate their observations, the officers instructed the pilot to land the helicopter approximately 150 yards from Hammett's home on the adjoining parcel of land.

In approaching Hammett's residence, the officers did not use the dirt road leading to the house and consequently did not see a no trespassing sign posted at its entrance. Instead, the officers took a straight path to the home from where the helicopter landed, crossing an unfenced and virtually unobstructed area of land. As they approached the house on foot for purposes of contacting the occupants and possibly conducting an investigation regarding the officers' previous observation, the officers reached the home and knocked on the door, shouting " 'Police.' " Receiving no answer, the officers looked through the window next to the door but saw no inhabitants. The officers then proceeded to circle the house,

calling out " 'Police' " and knocking on the walls as they went. As they circled the house looking for a back entrance, approximately 10 to 15 feet away from having completed the circle, Officer Kerr observed a small crack in the overlapping pieces of corrugated steel siding forming the walls of Hammett's residence. The crack was ½- to 1-inch wide, and through it the officers observed at least three marijuana plants inside the residence.

Hammett contended that the exclusionary rule applied because the search warrant was improperly based on a false statement in the warrant affidavit and because Officer Correia's observation of marijuana through the crack in the wall of Hammett's residence was the product of an unconstitutional search without a warrant and, therefore, could not be the basis for establishing probable cause. The district court noted that while the warrant contained a misstatement that the officers had seen marijuana from the flyover, what the officers observed from above raised only *suspicion* as to the presence of marijuana—which is why they landed to investigate. See 236 F.3d at 1057-59.

While the case does not directly decide the issue with which we are presented in this case, it nevertheless indicates that where the observation from the preintrusion view merely provides *suspicion*, that suspicion may be used for further inquiry of the residents of the home. Further investigation based on such a suspicion does *not* necessarily invalidate the plain view exception to the search warrant requirement. See *Hammett*, 236 F.3d at 1159-60. In this case, the State does not contend that the officer's observation of the bottles in the trash bag through his binoculars gave rise to probable cause, particularly when Officer Jager testified that he was unable to identify the contents of the bag from his viewpoint on the highway.

The critical issue that caused the majority to conclude that the seizure of the trash bag was unlawful, which is expressed by the majority as "[a]n additional reason for us to reject the State's request to apply the plain view doctrine for justification of the seizure," is that Officer Jager exceeded the scope of his lawful intrusion on defendant's property in seizing the trash bag. 283 Kan. at 296. It is important to note that the majority acknowledges that

the knock and talk allowed the officers to come within the curtilage to ask questions. The majority also acknowledges that "as here, while driving to and from the parking spot on the driveway, while walking to and from the front door, and while at the front door, the officers may make lawful observations. [Citations omitted.]" 283 Kan. at 296.

The majority noted that Officer Jager did not have the run of the entire Fisher property or the right to make a general investigation in the curtilage based on reasonable suspicion. Quoting *State v. Seagull*, 95 Wash. 2d 898, 902-03, 632 P.2d 44 (1981), the majority states:

" 'It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. [Citation omitted.] An officer is permitted the same license to intrude as a reasonably respectful citizen. [Citation omitted.] However, *a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy.'* (Emphasis added.)" *Fisher*, 283 Kan. at 297.

The majority then concludes:

"There is little evidence in the record indicating that at the time Jager observed the bag while on the premises he was performing any legitimate functions, *i.e.*, observing while moving around the house exterior to look for another door of observing while on his way back to his vehicle after no one answered the knock. *Admittedly, he testified at one point that he was 'circling around to leave the property' when he observed the bag's contents.* On this record, however, we find the evidence insufficient for the State to meet its burden that Jager did not exceed his lawful intrusion, *i.e.*, the knock and talk. As noted, we may make a factual determination from the record when neither lower court has addressed the issue, *e.g.*, in the absence of findings by the district court." (Emphasis added.) 283 Kan. at 298.

Perhaps the majority is right that it is able to make factual determinations from the record when neither of the lower courts has addressed this issue. However, those findings of fact cannot ignore the only evidence in the record as to Officer Jager's activities while leaving the premises. Officer Jager stated more than once:

"A. In my—At the time I was driving a Ford Explorer as a patrol vehicle. I pulled my patrol vehicle in the driveway, went to the front door, knocked on the door

several times. I got back in my vehicle and there's a circle driveway that goes around the back side of the residence there, got in, drove by. When I was driving by the white trash bag I noticed Actifed blister packs, several Heet bottles, and—and that's when I collected the white trash bag.

. . . .

"A. Well, I was circling around to leave the property. I had taken this, if you want to say southwest part of the circle drive and started back around when I—approximately right here when I saw the white trash bag, and I could see that there were Heet bottles, Actifed blister packs and pseudoephedrine.

"Q. [County Attorney:] The white trash bag where it was located, could that trash bag been [*sic*] observed from the highway?

"A. Yes, sir, that's where I first observed it from.

"Q. And which highway would that be?

"A. Highway 63.

"Q. Which side of the house does 63 run on?

"A. It ran on the east side, north and south."

Contrary to the majority's conclusions, there certainly is evidence in the record to support a finding that at the time Officer Jager observed the trash bag, he was performing a legitimate function—that is, he was leaving the premises by the only reasonable and safe route offered by the residents of the premises.

The residence faces Highway 63. The lane leading into the premises is a single lane. The officer parked in front of the house and approached the front door. When he knocked and found no one in the house, he got in his vehicle and used the circular drive to exit the property. As he was doing so, he observed in plain view the contents of the trash bag, which were immediately recognizable as possible evidence of a crime. He was within his rights at the time while exiting the property to seize the bag in question.

The very reason for the turnaround is so that people can exit the property without having to back onto Highway 63. Naturally, it provides an invitation to those coming onto the property to leave in a safe and reasonable manner, and that was exactly what Officer Jager was doing. Photographs entered into evidence establish that fact. To back out of the residence onto a highway would have been unreasonable for the officer. Thus, the majority's factual determination that the evidence was insufficient for the State to meet its burden that Officer Jager did not exceed his lawful intrusion is

without support in the record and is contrary to the facts of the case.

The majority next states that

"[t]he weight of the evidence reveals that once Jager's knock and talk was complete, instead of driving away from the house to the highway, he simply drove deeper into the property on the driveway—according to the photographs, perhaps as much as 50 yards—directly to the previously observed bag. Once there, from his vehicle he noticed that it contained Actifed blister packs and, in confirmation of his earlier opinion, Heet bottles. He got out of the vehicle and seized the bag.

"Indeed, the evidence in the record reveals that the county attorney had advised Jager before he ever entered the property that the bag was outside the curtilage and, as a result, he 'could obtain the bag' without more. The record evidence reveals that instead of going directly to seize the bag, Jager wished to first conduct a knock and talk. Once that mission was unsuccessful, the only obstacle apparent to Jager before he seized the bag per the county attorney's advice had been eliminated. He drove on the driveway directly to the bag and seized it." *Fisher*, 283 Kan. at 298.

The above conclusions are contrary to the only testimony of record. It is important to note again that Officer Jager did not go directly to the bag and seize it. It must also be noted that the officer rejected the county attorney's advice and instead elected to knock and talk with the residents in furtherance of his investigation and suspicions. The majority seems to assume that the officer's knock and talk was a pretext for his intention to enter the property and seize the bag, due to his preintrusion binocular observation. That assumption is belied by the record. Instead of following the county attorney's advice and seizing the bag immediately, the officer did knock on the door and received no answer. He then exited the premises via the only reasonable way to do so. During his exit, he observed the translucent trash bag. His opinion about the Heet bottles was confirmed, and he also observed additional evidence of blister packs. Here, Officer Jager utilized appropriate investigatory techniques running counter to the county attorney's suggestions.

It must further be noted that the officer did not engage in an exploratory search; he did not investigate the shed from where a pungent ether smell was emanating. He lawfully entered the premises, knocked on the door, and as he was leaving the premises by the invited and safe route, observed from his patrol vehicle in plain

view what was immediately recognized as possible evidence of a crime. At that time, he was lawfully leaving the premises and had probable cause to seize the trash bag containing the incriminating evidence. The above characterization of the facts by the majority assumes that the motives of the officer in his knock and talk was merely a subterfuge to get him on the premises so he could seize the bag. There is no evidence to support such an assumption.

There was a sound basis in the evidence for the plain view exception to the warrant requirement. As stated by the United States Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 29 L. Ed. 2d 564, 91 S. Ct. 2022, *reh. denied* 404 U.S. 874 (1971):

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came *inadvertently* across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, *or some other legitimate reason for being present unconnected with a search directed against the accused*—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." (Emphasis added.)

It is important to note that the United States Supreme Court has never embraced the second element of *Coolidge* that the plain view must be "inadvertent." See *Horton v. California*, 496 U.S. 128, 130, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990); *Arizona v. Hicks*, 480 U.S. 321, 329-30, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987) (White, J. concurring); *Texas v. Brown*, 460 U.S. 730, 744, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983) (White, J., concurring). Rather, "[t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." *Illinois v. Andreas*, 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 103 S. Ct. 3319 (1983). Finally, the seizure must be supported by probable cause. *Hicks*, 480 U.S. at 326-27.

Here Officer Jager was lawfully on the defendant's property for a knock and talk. As he was leaving the property by the way offered

by the resident, the circle drive, he observed in plain view the contents of the trash bag, which were immediately known by the officer to contain evidence of a crime. This observation provided probable cause to seize the bag.

Notwithstanding the advice of the county attorney, Officer Jager did not seize the bag immediately and did not engage in an exploratory search of the premises (such as the shed from where the ether smell emanated) but observed from his patrol vehicle incriminating evidence in the translucent bag as he was leaving the premises. I would therefore concur with the opinion of the district court and the decision of the Court of Appeals that the officer's seizure of the bag from defendant's premises was justified by the plain view doctrine, thereby validating the search warrant based upon the contents of the trash bag lawfully seized and other evidence contained in the affidavit. In every other respect I agree with the majority opinion.

McFARLAND, C.J., and LUCKERT, J., join the foregoing concurring opinion.

ALLEGRUCCI, J., dissenting: I agree with the majority that the district court erred in failing to suppress the warrantless seizure of the trash bag. I disagree with the majority's rationale that absent the contents of the trash bag there was sufficient "lawfully obtained evidence" to support the magistrate issuing the search warrant. In my view, we have a failure by the State to establish that a crime has been committed on the defendant's property.

The majority justifies its decision on the observations of an officer and unidentified citizens. The observations by the citizens were: (1) burning of trash outside giving off a peculiar smell; (2) a van arrived, and several boxes were unloaded; and (3) several vehicles came and, after a short time, left. The officer observed: (1) a strong smell of ether and (2) through binoculars that there were yellow containers in the trash bag. None of these observed acts were unlawful or criminal. Only the strong smell of ether could possibly result from illegal activity, and the majority correctly notes that the smell of ether standing alone does not constitute probable cause. The yellow containers were not identified as Heet bottles

until the trash bag was unlawfully seized. Nonetheless, the possession of Heet is not unlawful, nor is its use, which could explain the peculiar smell.

The majority applies the totality of circumstances as if it were a magical formula to find probable cause where none exists. How does the totality of several perfectly lawful activities constitute probable cause that a crime has been committed? Granted the activity, in its totality, may be suspicious, but suspicion is not sufficient for a magistrate to issue a search warrant.

This court in reviewing a motion to suppress evidence does not reweigh the evidence, nor do we rubber stamp an improper determination of probable cause in the guise of the totality of the circumstances analysis. Here the question is whether there was substantive evidence to support the magistrate's determination that probable cause existed to issue the search warrant. There was not, and the motion to suppress should have been granted.

I would reverse both the district court and the Court of Appeals and remand for a new trial.